23

POSTED ON WEB SITE

**F O R   P U B L I C A T I O N**

FILED

JUN – 5 2006

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                               ) Case No. 06-10069-B-11
                                                    )
A Partners, LLC,                                    ) DC No. BMJ-2
                                                    )
                        Debtor.                     )
                                                    )
_____)
                                                    )
Scripps GSB I, LLC,                                 )
                                                    )
                        Movant,                     )
                                                    )
        v.                                          )
                                                    )
A Partners, LLC,                                    )
                                                    )
                        Respondent.                 )
                                                    )

**MEMORANDUM DECISION REGARDING MOTION FOR
RELIEF FROM THE AUTOMATIC STAY**

Albert J. Berryman, Esq., of Baker, Manock & Jensen, P.C., appeared on behalf of movant, Scripps GSB I, LLC.

Estela O. Pino, Esq., of Pino & Associates, appeared on behalf of respondent and debtor, A Partners, LLC.

Before the court is a motion for relief from the automatic stay. Scripps GSB I, LLC ("Scripps GSB"), wants to complete a non-judicial foreclosure of its first priority trust deed against a commercial building known as the Guarantee Savings Building and an adjacent parking structure (hereinafter, the "Guarantee Buildings" or the "Properties"). The debtor, A Partners, LLC, is a California limited liability company ("Debtor"). The Guarantee Buildings are not owned by the Debtor, they are owned by a related limited liability company known as AB Parking Facilities, LLC ("AB Parking"). The Debtor holds a note from AB Parking (the "AB Parking Note") secured by a deed of trust against the Guarantee

Buildings (the "Debtor's Lien"). The Debtor's Lien is fifth in order of priority behind four other deeds of trust held by Scripps GSB, a related entity, Scripps Investments and Loans, Inc. ("Scripps Investments"), and others.[1] The Debtor opposes Scripps GSB's motion.  However, the Debtor has little cash and it cannot exercise the rights of a junior lienholder under California law to protect its security interest in the Guarantee Buildings. For the reasons set forth below, Scripps GBS's motion for relief from the automatic stay will be granted. Scripps GSB also asks the court to waive the provisions of Fed.R.Bankr.P. 4001(a)(3), which automatically stays the effect of this ruling for 10 days unless the Rule is waived. Because Scripps GSB's foreclosure sale cannot take place for at least 20 days after this ruling is entered, that request will be granted as well.

This Memorandum Decision contains the court's findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. The bankruptcy court has jurisdiction pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 362. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## FACTS AND PROCEDURAL BACKGROUND

### The Foreclosure and Receivership Litigation.

Scripps GSB is the successor-in-interest to CapitalSource Finance, LLC, which initiated both a non-judicial foreclosure against the Guarantee Buildings, and a judicial receivership/foreclosure action against the Properties and AB Parking in the Superior Court of California for the County of Fresno (the "Receivership Action"). Scripps GSB was not scheduled as a creditor of the Debtor and it has not filed a proof of claim in this bankruptcy case. The Debtor was not named as a defendant in the Receivership Action, even though it holds a

---

[1] Scripps Investments is the manager of Scripps GSB. The court notes that both entities are represented in this proceeding by the same law firm.

1  junior lien against the Guarantee Buildings.[2]  Scripps GSB's non-judicial

2  foreclosure commenced in August 2005, prior to this bankruptcy, and the initial

3  three-month "notice of default" period prescribed in Cal.Civ.Code § 2924 has now

4  expired.  Scripps GSB is ready to publish a notice of sale pursuant to Cal.Civ.Code

5  § 2924f(b) and proceed with its foreclosure.

6  **The Guarantee Buildings and the Secured Debt.**

7      AB Parking is deeply in debt and the Guarantee Buildings are heavily

8  encumbered.  Scripps GSB offered into evidence an appraisal that values the

9  Guarantee Buildings at approximately $22 million, which is far less than the

10  secured debt against the Properties.  The Debtor contends, through the declaration

11  of its manager, Ronald Allison ("Allison"), that an unnamed, but qualified, entity

12  has given AB Parking a bona fide letter of intent to purchase the Guarantee

13  Buildings for $70 million, a price which exceeds the secured debt.[3]

---

16     [2]There is a dispute in the State court over whether the Receivership Action is stayed by the filings of this bankruptcy, the chapter 11 bankruptcy of Mauldin-

17  Dorfmeier Construction, Inc. ("Mauldin-Dorfmeier" - case number 05-11402 filed on February 28, 2005), and the bankruptcy of Charles W. Briggs ("Briggs" -

18  case number 05-62659 filed on October 28, 2005).  Mauldin-Dorfmeier was the holder of the fourth priority lien against the Guarantee Buildings.  Briggs is a co-

19  owner of AB Parking, a guarantor of the debt to Scripps Investments and Scripps GSB, and a named defendant in the Receivership Action.  The question of

20  whether the Receivership Action is proceeding in violation of the automatic stay has not been presented to this court for resolution.

21     Mauldin-Dorfmeier is seeking approval of a compromise agreement with Scripps GSB and Scripps Investments to retroactively nullify the automatic stay

22  in its bankruptcy case, validate the actions of CapitalSource Finance, LLC, and permit Scripps GSB to foreclose against Mauldin-Dorfmeier's lien.  That motion

23  was opposed by Allison, Briggs, AB Parking, and the Debtor, and is currently under submission.

24

25     [3]Allison and his wife own or control 100% of the membership interest in the Debtor.  Allison was at one time also a co-owner and manager of AB Parking.

26  There is a pending dispute between Allison and Scripps Investments over a pre-petition foreclosure against Allison's membership interest in AB Parking.

27  Scripps Investments contends that it now controls 50% of AB Parking.  The Debtor contends that the Scripps entities and the Receiver have refused to

28  cooperate with AB Parking's efforts to market the Guarantee Buildings.  For that reason, Allison declined to identify the prospective purchaser.

3

The first three deeds of trust against the Guarantee Buildings secure promissory notes held by Scripps GSB and Scripps Investments (collectively, the "Scripps Notes"). The Scripps Notes are fully matured and bear interest at their respective default rates which range from 14% to 24% per annum. The aggregate original principal balance on all of the Scripps Notes totals $37 million. The aggregate monthly interest accrual on the Scripps Notes exceeds $548,000.[4] The original principal balance of Scripps GSB's note, secured by the first priority lien, is $23 million and the monthly interest accrual exceeds $268,000.

The fourth priority lien is held by St. Paul Fire and Marine Insurance Company, successor-in-interest to Mauldin-Dorfmeier (the "MDC Lien") through Mauldin-Dorfmeier's chapter 11 plan of reorganization. *See* footnote 2. The original principal balance on the obligation secured by the MDC Lien is $630,000. The record is unclear as to the interest rate, the accrued interest, and the balance due on the Mauldin-Dorfmeier obligation.

**The Helm Building.**

The Debtor owns another commercial building known as the Helm Building, which the Debtor values on its schedules at $15 million. The Helm Building is undergoing a major renovation and is largely unrentable. The record is silent regarding the status of, and source of funds for, the renovation project. The Helm Building currently has six retail tenants who pay a small irregular amount of rent to the Debtor.[5] All rent is cash collateral for the senior lien held by Scripps

---

[4]The Scripps Notes provide for the compounding of interest such that accrued interest becomes part of the principal balance. Scripps GSB contends that the balance now due on the Scripps Notes actually exceeds $48 million. The Debtor disputes the calculation of accrued interest. However, there is no dispute as to the monthly interest accruing on the face of the Scripps Notes and that number alone is sufficient to support the court's ruling.

[5]According to the Debtor's bankruptcy schedules, the Debtor collected rent from the Helm Building in the amount of $116,545.57 for the entire 2005 fiscal year. The Debtor's monthly operating reports disclose that the Debtor has collected rents from the Helm Building for the months of February, March, and

4

Investments, which has not consented to its use.

The Debtor's schedules report that at the commencement of this bankruptcy case, the Debtor had cash bank deposits totaling $145.95. On March 13, 2006, this court authorized the Debtor to borrow $40,000 from Allison on an unsecured basis (the "Motion to Borrow"). The Debtor needed the money to fund the Debtor's operating expenses, including insurance, employee salaries, and utilities for the Helm Building. There was no money in the proposed budget for any payments to secured creditors. Allison was personally funding the operations of the Debtor prior to the bankruptcy. The Debtor's bankruptcy schedules list Allison as an unsecured creditor with an estimated claim in excess of $400,000.

The Helm Building is collateral for three secured obligations, all of which are in default. The senior obligation, in excess of $1.2 million, is owed to Scripps Investments. Scripps Investments contends that the Helm Building is only worth about $1 million and it has a motion for relief from stay pending in this court to complete the non-judicial foreclosure of its first priority lien. The second trust deed secures a group of obligations owed to Mauldin-Dorfmeier. Mauldin-Dorfmeier has filed a proof of secured claim in this case in excess of $1.8 million. The third trust deed secures the Debtor's commercial guarantee of AB Parking's obligation to Scripps Investments, the debt which is also secured by the third trust deed against the Guarantee Buildings. That obligation has a principal balance in excess of $3 million. In support of the Motion to Borrow, Allison represented that the Debtor is actively seeking a lender to refinance all of the debt against the Helm Building.

/ / /

/ / /

/ / /

_____

April 2006, in the amounts of $9,484.91, $5,666.67, and $5,511.03 respectively.

5

**The Effect of a Foreclosure.**

The Guarantee Buildings are not properties of any bankruptcy estate and are not protected by an automatic stay. The only reason Scripps GSB needs relief from stay in this bankruptcy is the fact the AB Parking Note, the Debtor's Lien, and the attendant rights and remedies of a junior lienholder, are property of this bankruptcy estate. According to the Debtor's bankruptcy schedules, AB Parking owes the Debtor more than $4.5 million on the AB Parking Note and that obligation is fully matured. However, the Debtor's Lien will be extinguished if Scripps GSB forecloses, relegating the Debtor to the status of an unsecured creditor of AB Parking. There is no evidence to suggest that AB Parking has any assets other than the Guarantee Buildings, or any way to repay its debts if the Guarantee Buildings are lost through foreclosure.

A foreclosure by Scripps GSB will also extinguish Scripps Investments' third trust deed against the Guarantee Buildings, thereby forcing the Debtor to honor the $3 million guarantee to Scripps Investments, which is secured by the Helm Building. Again, there is no evidence to suggest that the Debtor will have any recourse against AB Parking for indemnity or repayment of this obligation after a foreclosure.

The electrical energy, heating and cooling for the Guarantee Buildings are provided through a system of fuel cells located on the site and operated (prior to the Receivership Action) by the Debtor. The Debtor's schedule of assets lists an "account receivable" from AB Parking for "electricity supply [sic] to the Guarantee Buildings" in excess of $718,500. There is a major dispute between the Debtor, the Receiver, and the supplier of the fuel cells over ownership of the electrical equipment, the obligation to maintain the equipment, and the Debtor's right to collect the utility fees. It is not clear how or when this dispute will be resolved, or whether it can be resolved without protracted litigation. Neither is it clear what will happen to the fuel cells and the "account receivable" if Scripps

6

1    GSB forecloses and AB Parking loses title to the Guarantee Buildings. More

2    crucial to this bankruptcy, there is no evidence to suggest that AB Parking will

3    have the ability to pay the "account receivable," even if the Debtor prevails in that

4    dispute.

5    **The Debtor's Opposition.**

6         The Debtor contends, *inter alia*, that the value of the Guarantee Buildings

7    greatly exceeds all of the liens and that a sale of the Properties is necessary to the

8    Debtor's reorganization. Based thereon, the Debtor proposes two scenarios in

9    opposition to this motion for relief from stay. The Debtor asks that all foreclosure

10    activity be suspended indefinitely until AB Parking can sell the Guarantee

11    Buildings in an "orderly fashion" for $65 million to $70 million. Alternatively, the

12    Debtor proposes to conduct its own foreclosure against the Guarantee Buildings

13    and to liquidate the Properties on its own. The Debtor has not made either of these

14    proposals formally in a chapter 11 plan.[6]

15

16                    **APPLICABLE LAW**

17         Scripps GSB moves for relief under § 362(d)[7] which provides:

18         On request of a party in interest and after notice and a hearing, the court

19

20         [6]The Debtor filed a chapter 11 plan and disclosure statement after oral
21    argument on this motion. The proposed plan provides for payment of the debt
      against the Helm Building from "business revenue" which will include rent from
22    the renovated Helm Building and cash flow from the fuel-cell operation. With
      regard to the Guarantee Buildings, the proposed plan does not provide for any
23    payments to senior lienholders to protect the Debtor's Lien. The proposed plan
      contemplates that AB Parking can still sell the Guarantee Buildings to pay all of
24    the secured debts, including the AB Parking Note without the need for a
      foreclosure by the Debtor. However, it does state without specifics that the
25    Debtor will "attempt to collect" the AB Parking Note. It also purports to
      permanently enjoin any foreclosure against the Debtor's Lien.

26         [7]Unless otherwise indicated, all chapter, section and rule references are to
27    the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of
      Bankruptcy Procedure, Rules 1001-9036, as enacted an promulgated prior to the
28    effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act
      of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

7

shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if–

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Pursuant to § 362(g), Scripps GSB has the burden of proof on the issue of the Debtor's equity. The Debtor has the burden of proof on all other issues. Although the Debtor has the ultimate burden of proof on the "cause" issue, Scripps GSB must produce some evidence in the first instance to support the "cause" allegation. *Tirey Distributing Company v. Sloan (In re Tirey Distributing Co.)*, 242 B.R. 717, 723 (Bankr. E.D. Okla. 1999) (quoting *In re Tursi*, 9 B.R. 450, 453 (Bankr. E.D. Pa. 1981)).

Scripps GSB moves for relief under both subsections 362(d)(1) and (d)(2). In opposition, the Debtor lodged with the court a Statement of Disputed Facts for which it requested an evidentiary hearing. However, virtually all of the factual disputes are tied to questions regarding the fair market value of the Guarantee Buildings (the "FMV"), cash flow from the Properties, and the amount of the senior debt.[8] The Debtor requested an opportunity to conduct discovery and to depose, *inter alia*, Scripps GSB's appraiser. However, the Debtor does not own the Guarantee Buildings and they are not property of this bankruptcy estate. The Debtor makes no showing how an adjudication of the disputed facts might affect its ability to protect the Debtor's Lien and exercise the rights it holds as a junior

---

[8]The Debtor offered evidence that the Receiver had collected rent and paid over to Scripps GSB at least $268,000 since commencement of the Receivership Action. In response, Scripps GSB acknowledged receipt of $348,000 from the Receiver. However, the rent revenue appears to be substantially less than the accruing monthly interest on the senior debt.

8

1    lienholder.  The material facts which support this ruling are already in the record,

2    they appear to be uncontroverted, and an evidentiary hearing is not necessary.

3

4    ## ANALYSIS AND CONCLUSIONS OF LAW

5    **The Debtor's Junior Lien Has No Economic Value to the Bankruptcy Estate.**

6        Debtor argues that the Debtor's Lien has "equity" within the meaning of

7    § 362(d)(2)(A) because the Guarantee Buildings have an FMV greatly in excess of

8    the senior liens.  The concept of "equity" in property is based on the premise that

9    the property itself has some economic value to its owner.  "Equity" is defined as

10   "[t]he amount by which the value of or an interest in property exceeds secured

11   claims or liens; the difference between the value of the property and all

12   encumbrances upon it."  BLACK'S LAW DICTIONARY 580 (8th ed. 2004).  The

13   property at issue here is a fifth priority security interest in the Guarantee Buildings,

14   not the Guarantee Buildings themselves.

15       The Debtor asks this court to assign an economic value to the Debtor's Lien

16   based on (1) the AB Parking Note, which is in default, and (2) the purported

17   "equity" in the Guarantee Buildings, which Debtor argues, would make the AB

18   Parking Note a fully secured asset of this bankruptcy estate.  The Debtor contends

19   that the Debtor's Lien should be valued in essentially the same way that the court

20   would calculate the value of AB Parking's interest in the Guarantee Buildings; *i.e.*,

21   FMV less the amount owed on the non-avoidable senior liens.  However, the

22   Debtor's interest in the Guarantee Buildings is materially different from that of the

23   fee holder.  The Debtor cites no authority for the proposition that a security interest

24   in real property should be valued, in the face of a senior lienholder's foreclosure,

25   based solely on a mathematical calculation of the equity in the underlying

26   collateral.

27       This discussion begins with an analysis of the Debtor's Lien and the

28   property rights, the proverbial "bundle of sticks," which attach to it.  The

9

commencement of this bankruptcy case created an "estate." § 541(a).  The estate is comprised of all legal and equitable interests of the debtor in property, wherever located and by whomever held, at the commencement of the case.  § 541(a)(1).  The nature and extent of the debtor's interest in property are determined by State law.  *First Federal Bank of California v. Cogar (In re Cogar)*, 210 B.R. 803, 809 (9th Cir. BAP 1997) (citing *In re Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir. 1986)).  Once that determination is made, federal bankruptcy law determines if the debtor's interest in property is property of the estate.  *In re Cogar*, 210 BR. at 809 (citing *In re King*, 961 F.2d 1423, 1426 (9th Cir. 1992); § 541(a)).

All of the rights which the debtor holds as a lien against real property are property of the bankruptcy estate under § 541.  *In re Capital Mtg. & Loan, Inc.*, 35 B.R. 967, 971 (Bankr. E.D. Cal. 1983).  However, the debtor's property rights come into the estate subject to the conditions, restrictions and limitations that attached to those property rights under State law prior to commencement of the bankruptcy.  5 *Collier on Bankruptcy*, (15th Ed. Revised), ¶ 541.04, pg. 541-12, 13.  To the extent that an interest in property is limited in the hands of the debtor prior to commencement of the case, it is equally limited as property of the estate.  The debtor-in-possession can assert no greater property rights than the debtor had on the date the case was commenced.  *Id.*; *see also Keller v. Keller (In re Keller)*, 185 B.R. 796, 800-801 (9th Cir. BAP 1995) (property rights which the debtor holds subject to reserved jurisdiction of the State Family Court remain subject to modification by the State court even after the debtor files bankruptcy).

Under California law, the rights of a holder of a mortgage or trust deed against real property are defined by statute.  They include the right to collect rents on default, the right to foreclose on default, the right to receive notice of the default in a senior lien, the right to purchase the property at a foreclosure sale, and the right to take title to the property in lieu of foreclosure with the consent of the owner.  Cal.Civ.Code §§ 2924b through 2924k, 2927; *see also In re Cogar*, 210

10

1  B.R. at 809.

2       The rights most pertinent to this analysis are the statutory rights of

3  reinstatement and redemption. When a senior lien against real property is in

4  foreclosure, the holder of a junior lien has the right to reinstate the senior debt, *i.e.*,

5  to cure any default in the senior debt up to five days prior to foreclosure by paying

6  the senior lienholder all amounts due at the time of tender, plus the reasonable

7  costs and expenses incurred in enforcing the senior obligation. Cal.Civ.Code §

8  2924c(a)(1) & (c). The junior lienholder also has a right to redeem the property

9  from a senior lien and to be subrogated to the benefits of the senior lien by paying

10  the full amount owed to the senior lienholder. Cal.Civ.Code §§ 2904-2905. Any

11  act which cuts off the rights of a junior lienholder in bankruptcy, such as the pre-

12  foreclosure rights of reinstatement and redemption, is a violation of the automatic

13  stay. *See Harsh Investment Corp. v. Bialac (In re Bialac)*, 712 F.2d 426, 432 (9th

14  Cir. 1983).

15       For the purpose of evaluating the Debtor's Lien in this bankruptcy, it is also

16  necessary to consider what the Debtor's interest in the Guarantee Buildings does

17  not include. Many of the rights and powers which inure to the benefit of a

18  landowner in bankruptcy are not available to a lienholder in bankruptcy. For

19  example, the debtor-in-possession of real property in chapter 11 has the benefit of

20  the automatic stay to protect its property from the creditors under § 362(a). The

21  debtor-in-possession has the right to obtain credit, *i.e.*, to borrow money secured

22  by a lien against the real property that is senior to, or equal to, the existing liens,

23  subject to a showing of adequate protection for the existing debt. § 364(c)(3). The

24  debtor-in-possession has the right to sell all or substantially all of the property to

25  pay claims (§ 1123(b)(4)) and the ability to modify the rights of the secured

26  creditors in a chapter 11 plan. § 1123(b)(5).

27       In contrast, the Debtor here is not in possession of the Guarantee Buildings.

28  The Debtor's Lien does not extend the automatic stay to the Guarantee Buildings.

11

It protects only the Debtor's security interest in the Properties. The Debtor's Lien does not give the Debtor the ability to sell the Guarantee Buildings, or even to borrow money against the Properties. Neither does the Debtor have the right to restructure any of the senior debt against the Guarantee Buildings through a chapter 11 plan. *In re Cogar*, 803 B.R. at 812 (the senior lienholder does not have a claim against the estate of the junior lienholder that could be modified through the junior lienholder's chapter 11 plan, even if the plan provides for transfer of the underlying real property to the debtor).

The Debtor's right to collect the rents from the Guarantee Buildings has no economic value here because it is subordinate to each senior lienholder's right to collect the same rents; indeed, it appears that those rents are already being collected in the Receivership Action. The Debtor's right to foreclose on default is conditioned on the Debtor's ability to complete that foreclosure before the Debtor's Lien is extinguished by the foreclosure of a senior lien. Again, that right has no economic value here because Scripps GSB has already started and substantially completed the non-judicial foreclosure process; the Debtor has not.

The Debtor has the right either to cure the default in the obligation to Scripps GSB, or to redeem the Guarantee Buildings and become subrogated to the rights of Scripps GSB. However, Scripps GSB's note is fully matured, so there is no curable "default." Therefore, the economic value of the Debtor's Lien in this case is tied to the Debtor's ability to redeem the Properties, *i.e.*, to pay the full balance due to Scripps GSB in cash. It is undisputed that the Debtor has no resources with which to exercise that right. The debt to Scripps GSB already exceeds $23 million and it increases each month, based on the interest accrual alone, by more than $268,000.

The Debtor's Lien is an interest in real property, but it is also a contract right, and the Debtor stands in the shoes of a creditor of AB Parking. When a creditor's collateral consists of a contract right, the value of the collateral is a

12

function of the creditor's ability to exercise that right. *In re Emarco, Inc.*, 45 B.R. 627, 629 (Bankr. M.D. Penn. 1985).

In *Emarco*, the debtor ("Emarco"), received a purchase order to install an elevator for a third party. Emarco assigned the purchase order to its bank to secure a loan; it was the bank's only collateral for the loan. However, because of a work stoppage caused by a strike, Emarco was unable to perform the contract. Emarco was forced to abandon the elevator contract in its chapter 11 bankruptcy and the project was ultimately completed by another contractor. The bankruptcy court ruled that the value of Emarco's interest in the contract was zero. Consequently, the bank was determined to be an unsecured creditor because it was "not able in any way to look to the collateral assigned to it for repayment of its debt." *Id.*

Here, the Debtor stands in essentially the same position as the bank in *Emarco*. It holds a contractual security interest which is subordinate to significant senior liens. The value of that interest is a function of the Debtor's ability to exercise its rights as a junior lienholder. The Debtor would have to redeem Scripps GSB's note to protect its junior lien from being extinguished in a foreclosure. That recourse is not available to the Debtor, so the Debtor's Lien has no practical value to this bankruptcy estate.

There is a distinction between having a security interest in property and having a "secured claim" against the property owner. The AB Parking Note may be a "secured" asset on the Debtor's books, but the court is not persuaded that the Debtor is in fact a "secured creditor" of AB Parking. "By definition, 'secured claim' requires availability of collateral to secure the creditor's right to payment." *In re Elliott*, 64 B.R. 429, 430 (Bankr. W.D. Mo. 1986) (citing *In re Emarco*, 45 B.R. at 629) (a creditor with a lien against personal property, a diamond ring, which disappeared without the debtor's permission and cannot be found, retained its security interest, but had an unsecured claim in the debtor's chapter 13 bankruptcy). Here, the Debtor's collateral, a fifth priority lien against a seriously

13

distressed piece of property, is literally unavailable to the Debtor for repayment of the AB Parking Note. The Debtor's Lien has little value to the Debtor, just as the missing jewelry had little value to the creditor in *Elliott*.

It is important to note that the courts in both *Emarco* and *Elliott*, never considered the face value of the underlying collateral, the balance due on Emarco's construction contract, and the value of Elliot's diamond ring, respectively. The purported "value" of the collateral was immaterial to the economic value of the creditors' liens because the collateral was unavailable to satisfy those liens. The Debtor disputes, *inter alia*, Scripps GSB's appraisal of the Guarantee Buildings and the interest accrual on the senior debt, but the court does not need to decide those disputed issues because the benefits of the Debtor's Lien are not available to the bankruptcy estate. The court cannot find that there is any "equity" in the Debtor's Lien within the meaning of § 362(d)(2)(A).

### The Debtor's Lien is Not Necessary to an Effective Reorganization Because the Senior Secured Debt Cannot Be Restructured Through a Chapter 11 Plan.

The Debtor argues that the Debtor's Lien is necessary to an effective reorganization within the meaning of § 362(d)(2)(B) because AB Parking is trying to sell the Guarantee Buildings, which it contends, if successful, will pay the AB Parking Note and significantly reduce the debt against the Helm Building. Alternatively, the Debtor argues that it can acquire title through a foreclosure of the Debtor's Lien and liquidate the Guarantee Buildings on its own. However, the Debtor's "game plan" requires this court to effectively impose a permanent injunction against the foreclosure of all senior liens against the Properties.

The Debtor's proposal amounts to a *de facto* plan of reorganization. Under the Debtor's "plan," Scripps GSB's secured debt would be materially "impaired" within the meaning of § 1124; the due date on Scripps GSB's note would be deferred indefinitely and Scripps GSB would be permanently stripped of its

14

foreclosure remedy under California law.[9]  The Debtor is essentially trying to achieve, indirectly through its opposition to this motion, a result which it cannot achieve directly through the chapter 11 plan confirmation process.  The holder of a junior lien against real property cannot restructure the senior liens against the same property through a chapter 11 plan, even if the plan provides for the debtor to first acquire the underlying property. *In re Cogar*, 210 B.R. at 809.

In *Cogar*, the bankruptcy estate held a third trust deed against an apartment building.  The debt to First Federal Bank secured by the first trust deed was in foreclosure.  In an effort to save some value from the third trust deed for the bankruptcy estate, the chapter 11 trustee tried to confirm a plan under which the estate would acquire the real property from its owner by a deed in lieu of foreclosure, the note secured by the first trust deed would be restructured, and the property would then be transferred back to the original owner, subject to the restructured debt.  The bankruptcy court confirmed the plan; the Bankruptcy Appellate Panel reversed.  After analyzing the nature of the senior lien and the debtor's interest in the apartment building, the court held:

> In summary, First Federal did not hold a claim against the bankruptcy estate which was subject to treatment in the Chapter 11 plan.  The real property was not property of the estate, as opposed to the estate's lien interest in the property.

*Id.* at 812.

The Debtor's "plan" for opposing this motion is based on several assumptions, all of which lack any foundational support.  The Debtor's opposition suggests that the Guarantee Buildings can be liquidated soon, without substantial risk or harm to Scripps GSB.  However, there is no evidence that AB Parking is ready to consummate a sale, and a foreclosure by the Debtor will take months to

---

[9]Under 11 U.S.C. § 1124(1), a secured claim is impaired under a chapter 11 plan if the plan alters the legal, equitable and contractual rights of the holder of the claim.

complete. Under California law, the foreclosure process will take a minimum of 110 days. The notice of default must be recorded for at least three months before the foreclosing creditor can publish the notice of sale. Cal.Civ.Code § 2924. The notice of sale must be published and posted for at least 20 days before the property can be sold. Cal.Civ.Code § 2924f(b). As a practical matter, allowing for the time it takes a foreclosure company to complete the necessary paperwork, conduct the necessary title search, and record, serve, and post the necessary notices, a non-judicial foreclosure in California could take substantially longer than the time prescribed in the statutes.

The court cannot assume that the Debtor would actually acquire title to the Guarantee Buildings through a foreclosure of the Debtor's Lien and ever be in a position to control their liquidation. At the foreclosure sale, the Debtor could offset from its bid, or "credit bid" up to the amount owed on the AB Parking Note, plus foreclosure costs. Cal.Civ.Code 2924h(b). However, if, as the Debtor contends, the Guarantee Buildings have substantial equity behind the Debtor's Lien, then it is not unlikely that one or more interested investors will competitively bid for the Properties at the foreclosure sale. The Debtor has no resources to compete in an overbidding contest.

Finally, the court cannot begin to estimate how long it would take, assuming the Debtor completes its foreclosure as planned, to find a buyer, to complete the buyer's due diligence, and to actually close escrow on a sale of the Guarantee Buildings. The court would be remiss to assume that the Properties will even be marketable in the event the Debtor does acquire them. An actual sale of the Properties could take months to consummate.[10] In summary, the Debtor's

---

[10]Scripps Investments has a motion for relief from stay pending in the Briggs' bankruptcy to foreclose a pledge of Briggs' membership interest in AB Parking. In response to that motion, Briggs filed a declaration which states that there is a lease dispute between AB Parking and one or more of the tenants. Briggs states that the lease dispute must be resolved as a condition of the

16

1   ability to acquire the Guarantee Buildings through a foreclosure, and then to sell
2   them to pay the senior debt in a reasonable period of time is mere conjecture.

3          When the court finds that the chapter 11 debtor has no equity in property
4   within the meaning of § 362(d)(2)(A), the debtor must establish the second prong
5   of the § 362(d)(2) inquiry, that the "property is necessary to an effective
6   reorganization." § 362(d)(2)(B). "What this requires is not merely a showing that
7   if there is conceivably to be an effective reorganization, this property will be
8   needed for it; but that the property is essential for an effective organization *that is*
9   *in prospect*." (emphasis original.) *United Sav. Assn. v. Timbers of Inwood Forest*
10  *Associates, Ltd.*, 484 U.S. 365, 375-76, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988).
11  This means that there must be "a reasonable possibility of a successful
12  organization within a reasonable time." *Id.* at 376. (citation omitted.) The
13  debtor's burden to make this showing increases as the exclusivity period expires.
14  *Id.*

15         A chapter 11 plan cannot be based upon a visionary scheme. *See* §
16  1129(a)(11); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,
17  761 F.2d 1374, 1382 (9th Cir. 1985). The Debtor's "plan" for opposing this
18  motion for relief from stay is fraught with speculation and uncertainty regarding
19  implementation and feasibility, and it further appears to be unconfirmable as a
20  matter of law. The court cannot find that an "effective reorganization" is in
21  prospect.
22  / / /
23
24
25  _____
26  purchase offer referred to in Allison's opposition to this motion. As discussed
    above, there is also a major dispute pending over ownership of the fuel cells and
27  equipment that produces electrical power, heating and cooling for the Guarantee
    Buildings, and the right to collect the utility fees. Presumably, that dispute over
28  essential utilities for the Properties will also have to be resolved before an escrow
    could close.

17

**Cause Exists to Grant Relief From the Automatic Stay Because There is No Source of Money to Service the Senior Debt.**

For all of the reasons discussed above, the court is also compelled to find that "cause" exists to grant relief from the automatic stay. § 362(d)(1). To begin, the court reiterates that AB Parking and the Guarantee Buildings are not before this court. The property protected by the automatic stay here is a fifth priority deed of trust against the Guarantee Buildings, not the Properties themselves. This court must make sure that its rulings in this case are consistent with the Bankruptcy Code and do not overstep the limitations on this court's jurisdiction. To the extent that the Debtor may seek to draw the Guarantee Buildings into this bankruptcy case, to extend the protections of the automatic stay to a non-debtor, or to vicariously reorganize AB Parking through this chapter 11 proceeding, the court must carefully scrutinize the Debtor's strategy.

The language of subsection 362(d)(1) is clear and unambiguous; the court *shall* grant relief for "cause." The term "shall" is ordinarily "the language of command." *Alabama v. Bozeman*, 533 U.S. 146, 153, 121 S.Ct. 2079, 2085, 150 L.Ed.2 188 (2001) (citations omitted). The term "cause," as it is used in § 362(d)(1), is not defined in the Bankruptcy Code. The Debtor contends that there is no "cause" to grant relief because Scripps GSB is "adequately protected" by the FMV of the Guarantee Buildings. However, the term "cause" in § 362(d)(1) is broader than the mere lack of adequate protection specifically mention in the statute. 3 *Collier on Bankruptcy* , (15th Ed. Revised) ¶ 362.07[3][a], pg. 362-84.19.

The term "cause" as used in § 362(d)(1) "is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." *In re Indian River Estates, Inc.*, 293 B.R. 429, 433 (Bankr. N.D. Ohio 2003) (citing *In re Texas State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995)).

18

Factors to consider in determining whether the automatic stay should be modified for cause include: (1) an interference with the bankruptcy; (2) good or bad faith of the debtor, (3) injury to the debtor and other creditors if the stay is modified; (4) injury to the movant if the stay is not modified; and (5) the relative portionality of the harms from modifying or continuing the stay. *In re Tirey Distributing Co.*, 242 B.R. at 723 (citing *Milne v. Johnson (In re Milne)*, 185 B.R.. 280 283 (D.C. N.D. Ill. 1995).

Applying the "cause" factors to this case, the court notes first that there is no allegation or evidence to suggest any bad faith by the Debtor. At the same time, it is difficult to find that the granting of relief here will interfere with the Debtor's bankruptcy. As discussed above, the Debtor is essentially an unsecured creditor of AB Parking; its interest in the Guarantee Buildings is subordinate to four other liens, all of which are in default; the Debtor cannot exercise any of its rights to protect the Debtor's Lien under California law; and it cannot control the liquidation of the AB Parking's assets in this bankruptcy. The Debtor cannot tie its reorganization effort to the financial fortunes of AB Parking, a non-party to these proceedings, which has no apparent ability to control or improve its own financial situation. While it is clear that a foreclosure against the Guarantee Buildings will "interfere" with AB Parking's financial affairs, that does not mean that the granting of relief to Scripps GSB will interfere with this bankruptcy in any way that the court could find to be inappropriate.

Looking at the fourth factor, injury to Scripps GSB if the motion for relief is denied, the facts weigh strongly in favor of granting relief. AB Parking's obligation to Scripps GSB is in material default. The debt to Scripps GSB is increasing at a rate in excess of $268,000 per month. The Guarantee Buildings are not generating enough net rent to cover the accruing interest on the debt. The Debtor cannot pay adequate protection. The Debtor's proposal to indefinately suspend the enforcement of the senior liens shifts all of the risk of delay and

19

1  failure to the senior lienholders.

2      Turning finally to the third and fifth "cause" factors, injury to the Debtor
3  and its creditors and the relative portionality of harm, the Debtor warns that AB
4  Parking's financial collapse will have a "catastrophic effect" on the Debtor.  It is
5  clear that a foreclosure will not improve the Debtor's ability to successfully
6  reorganize in chapter 11.  At the same time, for the reasons discussed above, the
7  court is not persuaded that a foreclosure will make the Debtor's financial condition
8  materially worse than it already is.  Much of the difficulty with this case, from the
9  Debtor's standpoint, is a function of the way the debt and the guarantees were
10  structured as a "house of cards" between the Debtor and AB Parking, the Debtor's
11  dependance on the financial survival of AB Parking, which is not before this court,
12  and AB Parking's apparent inability to solve its own problems.  Not every problem
13  can be fixed in the bankruptcy court, regardless of how catastrophic the possible
14  result.

15  **Waiver of Rule 4001(a)(3).**

16      Federal Rule of Bankruptcy Procedure 4001(a)(3) provides that an order
17  granting a motion for relief from an automatic stay is stayed until the expiration of
18  10 days after the order is entered, unless the court orders otherwise.  Scripps GSB
19  requests that the court waive the application of this rule because more than
20  $89,000 of interest will accrue on the obligation to Scripps GSB during the 10-day
21  stay.  The Debtor is unable to pay Scripps GSB for the additional interest which
22  will accrue during the stay.  Rule 4001(a)(3), which was added by the 1999
23  amendments to the Federal Rules of Bankruptcy Procedure, recognizes that
24  motions granting relief from the stay can have enormous consequences for the
25  parties involved and can often dictate the success or failure of the entire
26  bankruptcy case.  Rule 4001(a)(3) enables the debtor, or other party who opposes
27  relief from stay, to seek a stay pending appeal of an adverse ruling.  9 *Collier on*
28  *Bankruptcy*, (15th Ed. Revised), ¶ 4001.04A, pg. 4001-18.  "[W]ithout a stay

pending appeal, appeals from such orders can often become moot if the party granted relief proceeds with a sale or some other action that cannot be easily undone." *Id.* at pg. 4001-19. This dispute, over the method for valuing a junior lien against real property, appears to be a case of first impression, and for that reason the court is reluctant to make any ruling which effectively cuts off the Debtor's ability to appeal.

Were Scripps GSB in a position to immediately complete its foreclosure sale, the court would be inclined to stay its order for 10 days to protect the Debtor's right of appeal.[11] However, the record suggests that Scripps GSB has not yet recorded its notice of sale. In that event, Scripps GSB cannot actually complete its foreclosure for at least 20 days (the statutory waiting period after recording the notice of sale under Cal.Civ.Code § 2924f(b).) The timing and delay inherent in the State's statutory foreclosure scheme give the Debtor all of the protection intended by Rule 4001(a)(3). The additional 10 days is unnecessary. Scripps GSB's request to waive Rule 4001(a)(3) is appropriate here, so long as it is clear that Scripps GSB may not actually conduct its foreclosure sale until after 10 days from entry of this order.

## **CONCLUSION**

Based on the foregoing, the court finds and concludes that cause exists to grant Scripps GSB's motion for relief from the automatic stay. The court also finds and concludes that the Debtor's Lien has no economic value to the Debtor, and it is not necessary to an effective reorganization, because the Debtor has no ability to protect its junior lien and exercise the rights of a junior lienholder under

---

[11]The record in the Mauldin-Dorfmeier bankruptcy case reflects that Scripps GSB does not yet have relief from the automatic stay to foreclose against the MDC Lien. *See* footnote 2. Regardless whether Rule 4001(a)(3) is waived here, Scripps GSB cannot move forward with its foreclosure until that issue is also resolved.

California law.  Unless AB Parking can consummate a sale of the Guarantee Buildings before Scripps GSB forecloses, the Debtor is essentially an unsecured creditor of AB Parking.  Scripps GSB's motion for relief from the automatic stay will be granted.

Scripps GSB's motion to waive the 10-day stay provision of Fed.R.Bankr.P. 4001(a)(3) will also be granted.  Scripps GSB may proceed to enforce its senior lien under applicable law.  The purpose of Fed.R.Bankr.P. 4001(a)(3) is achieved so long as Scripps GSB cannot actually complete a foreclosure sale until after 10 days from entry of this order.

Dated:   June ____5____, 2006

W. Richard Lee
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

    The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities listed at the address shown on the attached list or shown below.

| | | |
|---|---|---|
| Estela O. Pino<br>4600 Northgate Blvd #215<br>Sacramento CA 95834 | Estela O. Pino<br>Fax #916-641-1888 | A Partners LLC<br>2339 Kern St<br>PO Box 170<br>Fresno CA 93721 |
| US Trustee<br>2500 Tulare St #1401<br>Fresno CA 93721 | Albert J. Berryman<br>5260 N Palm Ave 4th Fl<br>Fresno CA 93704-2209 | Albert J. Berryman<br>Fax #559-432-5620 |

DATED: 6-5-06          By: _____
                              Deputy Clerk

EDC 3-070 (New 4/21/00)