# POSTED ON WEB SITE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re )<br><br>A Partners, LLC, )<br><br>      Debtor. )<br>———————————————— )<br>Scripps Investments & Loans, Inc., )<br>et al., )<br><br>      Movants, )<br><br>    v. )<br><br>A Partners, LLC, )<br><br>      Respondent. )<br>———————————————— ) | Case No. 06-10069-B-11<br><br>DC No. BMJ-1 |



**FILED**

JUL 1 4 2006

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**MEMORANDUM DECISION REGARDING MOTION FOR
RELIEF FROM THE AUTOMATIC STAY**

Albert J. Berryman, Esq., of Baker, Manock & Jensen, P.C., appeared on behalf of movants, Scripps Investments & Loans, Inc., et al.

Estela O. Pino, Esq., of Pino & Associates, appeared on behalf of respondent and debtor-in-possession, A Partners, LLC.

Before the court is a motion for relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (2).[1] Scripps Investments & Loans, Inc., et al. ("Scripps Investments") wants permission, on behalf of itself and all junior lienholders, to proceed with the non-judicial foreclosure of various trust deeds against a commercial building known as the Helm Building (the "Helm Building" or the "Property"). The debtor-in-possession, A Partners, LLC, is a California limited liability company ("Debtor"). For the reasons set forth below, Scripps Investments' motion will be granted as to the first and third priority trust deeds

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted an promulgated after the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.



which it holds or controls. The request for relief from stay on behalf of all other entities holding liens or charges against the Helm Building will be denied. Scripps Investments also asks the court to waive the provisions of Fed.R.Bankr.P. 4001(a)(3), which automatically stays the effect of this ruling for 10 days unless the Rule is waived. Because Scripps Investments could potentially conduct a trustee's sale of the first trust deed within 10 days after this ruling is entered, that request will only be granted in part.

This Memorandum Decision contains the court's findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. The bankruptcy court has jurisdiction pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 362. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## FACTS AND PROCEDURAL BACKGROUND

### The Helm Building.

The principal asset of the Debtor's estate, and the focus of this motion, is the Helm Building. The Debtor purchased the Helm Building in 2003 for $1.55 million. The Debtor's manager, Ronald Allison,[2] testified that the Debtor acquired the Property for less than its market value, but no evidence was offered as to the condition of the Property or the actual value at the time. Constructed in or about 1914, the Helm Building sits on Fresno's downtown Fulton Mall, an area that is in need of and undergoing redevelopment. The Helm Building is a ten-story steel, concrete and brick structure with a basement. According to Mr. Allison, the Helm Building has, including the basement, approximately 82,500 gross square feet of space; approximately 70,000 square feet are "net rentable." The Property sits on one of two adjacent 7,500 square foot lots. The second lot is vacant, but available

---

[2] Ronald Allison and his wife also own or control 100% of the membership interest in the Debtor.

for future development.  The Helm Building has some on-site parking.

The Helm Building is undergoing a major renovation and is largely unrentable.  Mr. Allison testified that the Debtor purchased the Helm Building for the purpose of redeveloping the Property.  He believes that the Property is particularly suitable for occupancy by agencies of the federal government based on its location and configuration.  The Debtor initially engaged the services of Mauldin-Dorfmeier Construction, Inc. ("MDC") to begin renovation of the Helm Building.  It is not clear from the record how much of that work was completed or how much the Debtor paid MDC for renovation work that was done.  Mr. Allison testified that the electrical service has been upgraded.  However, the record also reveals the following issues:  the interior of the second, third, and fourth floors of the Helm Building has been demolished; all six floors above that are vacant and in need of substantial repairs before they can be occupied; three of the four elevators are non-functional and all of the elevators need to be replaced; MDC is no longer working on the Helm Building; MDC filed its own chapter 11 bankruptcy in 2005; and MDC holds a group of promissory notes for work it performed totaling more than $1.1 million secured by a deed of trust against the Property.  The record is silent regarding a budget, a timetable, and a source of funds for the renovation project, although Mr. Allison testified, without specifics, that he believes the Debtor can get financing to complete the needed work.

The Helm Building currently has six retail tenants on the first floor who collectively pay a small irregular amount of rent to the Debtor.[3]  All rent is cash collateral for the senior lien held by Scripps Investments, which has not consented

---

[3]According to the Debtor's bankruptcy schedules, the Debtor collected rent from the Helm Building in the amount of $116,545.57 for the entire 2005 fiscal year.  The Debtor's monthly operating reports disclose that the Debtor has collected rents after commencement of the bankruptcy for the months of February, March, April and May 2006, in the amounts of $9,484.91, $5,666.67, $5,511.03, and $5,623.04 respectively.

1    to its use.  The Debtor's schedules report that at the commencement of this
2    bankruptcy case, the Debtor had cash bank deposits totaling $145.95.  On March
3    13, 2006, this court authorized the Debtor to borrow $40,000 from Mr. Allison on
4    an unsecured basis (the "Motion to Borrow").  On June 29, 2006, this court
5    authorized the Debtor to borrow an additional $40,000 from Mr. Allison on an
6    unsecured basis.  The Debtor needed the money to fund its operating expenses,
7    including insurance, employee salaries, and utilities for the Helm Building.  There
8    was no money in the proposed budgets for any payments to secured creditors.  Mr.
9    Allison was personally funding the operations of the Debtor prior to the
10   bankruptcy.  The Debtor's bankruptcy schedules list Mr. Allison as an unsecured
11   creditor with an estimated claim in excess of $400,000.
12        The Helm Building is collateral for multiple obligations secured by three
13   deeds of trust; all of the obligations are in default.  Scripps Investments holds the
14   "purchase money" promissory note secured by the first trust deed.  It had a balance
15   due as of January 26, 2006, in excess of $1.219 million and accrues interest at the
16   daily rate of $625.70.  The purchase money note first matured on September 1,
17   2003.  Thereafter, the Debtor entered into a series of forbearance agreements, the
18   last of which matured in late 2004.  The Debtor made its last payment to Scripps
19   Investments in January 2005, after which Scripps Investments commenced
20   foreclosure.  The Debtor has not made any payments to Scripps Investments since
21   commencement of the bankruptcy case.
22        The second trust deed secures the obligations owed to MDC.  MDC filed an
23   amended proof of claim in this bankruptcy showing a balance due as of January
24   26, 2006, in excess of $1.149 million.[4]  MDC's representative, Alan Dorfmeier,
25
26        [4]The Debtor presented evidence that it is in the process of negotiating a
     "compromise" with MDC whereby MDC will accept $500,000 as full payment of
27   its secured claim if paid not later than the end of January 2007.  The purported
     compromise has not yet been reduced to writing and it has not yet been presented
28   to the bankruptcy court for approval in MDC's chapter 11 bankruptcy.  However,

4

1    confirmed the amounts stated in the amended proof of claim. Interest accrues on

2    the debt to MDC at the rate of $354 per day. The Debtor has not made any

3    payments to MDC since commencement of this bankruptcy.

4         The third trust deed secures the Debtor's commercial guarantee of a debt

5    owed by AB Parking Facilities, LLC ("AB Parking") to Scripps GSB II, LLC

6    ("Scripps GSB II"), a related entity to Scripps Investments.[5] This debt is also

7    secured by a third trust deed against AB Parking's property referred to in these

8    proceedings as the Guarantee Buildings. That obligation has a principal balance as

9    of January 26, 2006, in excess of $4.541 million, and accrues interest at the daily

10   rate of $2,948,42. AB Parking is in serious financial trouble and it does not appear

11   that AB Parking will be able to pay this obligation.[6] For that reason, the court

12   must include the full amount secured by Scripps GSB II's third trust deed in the

13   total debt calculation.

---

the most important consideration for this dispute is the fact the Debtor's purported compromise with MDC, and MDC's purported agreement to release any secured debt against the Helm Building, are contingent upon the Debtor's ability to perform, *i.e.*, to pay ½ million dollars by a date certain that is months in the future. Nothing will be released unless and until that happens. MDC's representative, Alan Dorfmeier, testified that MDC's secured claim would revert to the full amount if the Debtor did not perform the proposed "compromise." For those reasons, the court cannot consider the MDC compromise in its present equity calculation.

    [5]Scripps GSB II apparently acquired the third trust deed and the underlying obligation from Scripps Investments after commencement of this bankruptcy case. Scripps Investments is the manager of Scripps GSB II. The court notes that both entities have been represented in this proceeding by the same law firm.

    [6]Scripps Investments holds or controls the first three priority liens against the Guarantee Buildings. The aggregate liability on those obligations exceeds $37 million. The Guarantee Buildings are in foreclosure. A foreclosure of the first or second trust deeds against the Guarantee Buildings will also extinguish Scripps GSB II's third trust deed against the Guarantee Buildings, thereby forcing the Debtor to honor the $3 million guarantee to Scripps GSB II, which is secured by the Helm Building. There is no evidence to show that AB Parking can or will do anything to prevent a foreclosure against the Guarantee Buildings. *See* footnote 7 *supra*.

Finally, the court notes that the Debtor has not paid the 2004-2005 real property taxes for the Helm Building. The redemption amount of that obligation now exceeds $25,000. Neither has the Debtor paid the 2005-2006 property taxes. Those delinquent payments now exceed $21,000. As of the evidentiary hearing, the total debt secured by liens and charges against the Helm Building, with taxes and accruing interest, substantially exceeded $7 million.

Scripps Investments contends that the Helm Building has a fair market value of $1 million. It offered into evidence a written appraisal and the testimony of Gregg Palmer, a MAI certified commercial property appraiser. Conversely, the Debtor values the Helm Building at $15 million. The Debtor's valuation is supported solely by the opinion testimony of Mr. Allison. The Debtor did not offer a third party appraisal to support its valuation.

## **APPLICABLE LAW**

Scripps Investments moves for relief under § 362(d) which provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if–

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Pursuant to § 362(g), Scripps Investments has the burden of proof on the issue of the Debtor's equity. The Debtor has the burden of proof on all other issues. Although the Debtor has the ultimate burden of proof on the "cause" issue, Scripps Investments must produce some evidence in the first instance to support the "cause" allegation. *Tirey Distributing Company v. Sloan (In re Tirey Distributing Co.)*, 242 B.R. 717, 723 (Bankr. E.D. Okla. 1999) (quoting *In re*

6

*Tursi*, 9 B.R. 450, 453 (Bankr. E.D. Pa. 1981)).

Scripps Investments moves for relief under both subsections 362(d)(1) and (d)(2). However, the grounds for relief are independent and relief can be granted under either subsection. The court is not required to determine under subsection 362(d)(1) whether the fair market value of the Helm Building is sufficient to adequately protect Scripps Investments' interest in the Property if it finds that the value does not exceed the total liens and that relief is otherwise warranted under subsection 362(d)(2).

## ANALYSIS AND CONCLUSIONS OF LAW

### There is No Equity in the Helm Building – § 362(d)2)(A).

The term "equity" in subsection 362(d)(2) is defined to mean the value of the subject property in excess of the total liens and charges. *Stewart v. Gurley*, 745 F.2d 1194, 1196 (9th Cir. 1984).

Looking first to the liens and charges against the Helm Building, the court has found, as set forth above, that the total liens and charges exceed $7 million. Therefore, to prevail under subsection 362(d)(2)(A), Scripps Investments needs only to establish, by a preponderance of the evidence, that the value of the Helm Building does not exceed $7 million. When the values are conflicting, the Bankruptcy Code only requires the court to determine whether the Debtor has equity in the Property, the court is not required to determine how much. Here, the parties' respective valuations differ by $14 million, a ratio of 15 to 1. The total liens fall squarely in the middle of the competing valuations. The court does not have to make a finding as to the actual value of the Helm Building unless that finding is necessary to the court's decision; unless it appears that the actual value is close to the total liens and charges and might affect the outcome one way or the other.

One of the most puzzling aspects of this case lies in the fact that the Debtor

7

did not produce a professional appraiser to corroborate Mr. Allison's opinion of
the Helm Building's value. Scripps Investments' valuation was supported by the
testimony of a MAI certified appraiser. Mr. Allison offered his opinion of value as
a representative of the owner of the Helm Building pursuant to Fed.R.Ev. 701.
Mr. Palmer testified as an expert witness pursuant to Fed.R.Ev. 702. Mr. Allison
was permitted to testify as a percipient witness, not an expert. Mr. Allison's
opinion of value differed from Mr. Palmer's opinion by a factor of 15 to 1. Based
on the extraordinary difference between the parties' respective positions, the court
must carefully scrutinize the methods by which the competing opinions were
derived. The court must determine how much weight to give the competing
testimonies. However, the parties' valuations are so far apart, the court cannot
selectively weigh and apply various portions of each testimony to derive a value
that lies somewhere in the middle. If the court is persuaded that one of the
opinions is correct, or approximately so, then it must also conclude that the other is
completely out of the proverbial "ball park." Mr. Allison's testimony is subject to
the same critical analysis as that of an independent appraiser. When the owner of
property is unable to provide a detailed explanation of how he or she arrived at a
lump-sum value for the property, the testimony may be insufficient to establish in
the court's mind an "actual belief . . . derived from the evidence" as to the validity
of the owner's opinion. *Russell*, Bankruptcy Evidence Manuel § 701.2 at page
1218 (West 2006 edition), quoting *In re Brown*, 244 B.R. 603, 612 (Bankr.
W.D.Va. 2000).

Mr. Allison testified that his opinion of value is based on his experience in
commercial property leasing and development, his familiarity with other buildings
in the area, and his general knowledge of redevelopment activity in downtown
Fresno. Mr. Palmer's appraisal was based, in part, on a detailed comparison of
"comparable sales" of other commercial buildings in downtown Fresno. At the
conclusion of Mr. Palmer's testimony, it was clear to the court what methods,

1   procedures and specific facts he used to derive a value for the Property. Mr.

2   Allison's valuation was not supported by any specific factual analysis. Indeed,

3   much of his testimony was focused more on trying to discredit Mr. Palmer's

4   appraisal. While it does appear that Mr. Allison has an extensive base of

5   knowledge regarding the Helm Building and the downtown redevelopment

6   industry, he was unable to "connect the dots"; that is, he was unable to pull

7   together a detailed explanation of how he arrived at the lump-sum value for the

8   Property which he asks the court to accept.

9        Mr. Allison testified generally that other developers are acquiring properties

10   in the downtown area for commercial redevelopment, but he offered no empirical

11   data by which the court could compare those other projects to the Helm Building.

12   Mr. Allison testified that the Helm Building could have a gross rental stream of

13   $304,176 per year once it is fully renovated and occupied, but he offered no

14   evidence to establish (1) how and when the Helm Building will achieve its full

15   income potential, (2) how the projected "gross" income would equate to "net"

16   income, and (3) how the estimated income stream would translate into a

17   calculation of the Property's present value.

18        In contrast, Mr. Palmer's analysis was set forth in a written report and he

19   testified at length regarding the information in that document and the basis for his

20   conclusions. Mr. Palmer testified that he did not use the "income" approach to

21   value the Helm Building; he relied on other accepted valuation methods because

22   approximately 90% of the Property is currently vacant and produces no income.

23   The Debtor had an opportunity to vigorously cross-examine Mr. Palmer regarding

24   his methods and conclusions, and various inconsistencies and errors in the

25   appraisal. Those inconsistencies and errors may affect the weight which the court

26   would give to Mr. Palmer's appraisal and could affect the outcome in a close

27   contest, but this is not a close contest. The defects in Mr. Palmer's appraisal do

28   not affect the admissibility of his testimony, and they were not sufficient to cause

1   the court to reject his testimony altogether.

2   　　　　At trial, the court asked Mr. Allison why he had not produced a professional

3   appraisal to corroborate or provide more support for his opinion of the Property's

4   value. He responded, in essence, that he did not have sufficient cash to pay the

5   estimated cost, $15,000, of a professional appraiser and that he had "better things

6   to do with the money." Both of these answers strike the court as implausible. Mr.

7   Allison has requested and received permission from this court to personally loan

8   $80,000 to the Debtor to pay for operating expenses. Mr. Allison testified at trial

9   that he had the funds to build a multi-story parking structure on the vacant land

10  adjacent to the Helm Building if given an opportunity to do so. Mr. Allison

11  represented in support of the Debtor's Motion to Borrow, in March 2006, that he

12  was then actively engaged in a search for refinancing. Mr. Allison and Mr. Briggs

13  both testified at this hearing that they have been negotiating with an unnamed third

14  party investor to purchase a major interest in the Debtor, which could close escrow

15  within 60 days. It is difficult for the court to believe that the Debtor can be

16  actively engaged in negotiating a multimillion dollar financing deal, and be within

17  60 days of closing escrow with a bona fide investor, and that no one has yet

18  commissioned a professional appraisal of the Debtor's assets.

19  　　　　The dramatic difference between the parties' competing valuations causes

20  the court to consider what it can and should infer from the Debtor's decision not to

21  produce a professional appraisal. When a party to litigation fails to call an

22  available witness whose testimony could be expected to favor him, the court can

23  draw a "missing witness" inference that the witness would have exposed facts

24  unfavorable to the party. *Bohm v. The Horsley Company (In re Groggel)*, 333 B.R.

25  261, 303-04 (Bankr. W.D. Pa. 2005), citing *United States v. Busic*, 587 F.2d 577,

26  586 (3rd Cir. 1978) (other citations omitted). "The missing witness inference is

27  inapplicable unless the information possessed by the absent witness is both

28  material, that is relevant to the case, and non-cumulative." *Id.* at 304. When it is

10

1   shown that a witness was not called for reasons that are reasonable and proper, no

2   unfavorable inference is permitted. *Id.* at 304, citing 29 Am.Jur.2d, *Evidence* §

3   247 (other citation omitted). Similarly, the missing witness inference is not

4   permitted if a party has good reason to believe the opponent has failed to meet its

5   burden of proof, *Id.* at 304, citing *Int'l Union, UAW v. N.L.R.B.*, 459 F.2d 1329,

6   1338 (D.C. Cir. 1972) (other citation omitted).

7         An inference is a "deduction of fact that may be logically and reasonably

8   drawn from another fact or group of facts found or otherwise established in an

9   action." *Giacalone v. Malget (In re Malget)*, 165 B.R. 933, 937 (Bankr. S.D. Cal.

10   1994), citing *Cal.Ev.Code* § 600(b) (West 1994).

11         Inferences are an indispensable tool of logical analysis and the finder of fact

12   may draw reasonable inferences that are supported by evidence of sufficient

13   probative value to form a rational basis for the court's conclusion. The inference

14   "must be drawn by reason from the facts on which it purports to rest." *In re*

15   *Malget*, 165 B.R. at 937, quoting *Dreijer v. Girod Motor Company*, 294 F.2d 549,

16   554 (5th Cir. 1961).

17         Here, the Debtor knew when this motion was first filed in late March 2006,

18   that Scripps Investments was relying upon a professional appraisal to prove its

19   case. The Debtor, through Mr. Allison, had the financial ability to retain and

20   produce its own expert witness to value the Property, but apparently chose not to.

21   Since Mr. Allison's opinion was based on generalities, the testimony of an expert

22   based upon specific facts and accepted appraisal methods would have been highly

23   relevant to the case and non-cumulative. The Debtor could not have reasonably

24   believed that the court would totally reject Mr. Palmer's appraisal, thus leaving

25   Scripps Investments unable to sustain its burden of proof. The Debtor did not

26   object to Mr. Palmer's qualifications to testify as an expert witness, or attempt to

27   exclude his appraisal at trial. Instead, the Debtor relied upon its efforts to impeach

28   and totally discredit Mr. Palmer in hopes that the court would find Mr. Allison's

11

testimony to be more believable.  The Debtor contends that the value of the Helm Building is 1,000 times the estimated cost of an appraisal that could have helped to establish that value.  While it was not improper for the Debtor to defend this motion without a professional appraisal, Mr. Allison's statement that he "had better things to do with the money" strikes the court as an unreasonable explanation for attempting to do so, considering the magnitude of what was at stake for the Debtor.

The Debtor's strategic decision not to produce an appraisal in opposition to this motion leads the court to logically deduce that the Debtor was not able to find an appraiser who would agree with Mr. Allison's valuation, and/or that the Debtor already had access to an appraisal which did not support Mr. Allison's opinion. Neither of those facts, standing alone, is directly probative of the Property's value. However, when Mr. Allison's testimony is subjected to the same critical analysis as Mr. Palmer's, either of those inferences would tend to impeach Mr. Allison's testimony and mitigate the weight which the court can give to his opinion.

Based on all of the testimony and evidence presented, and given the choice between two irreconcilable values, the court is persuaded that the fair market value of the Helm Building does not exceed $7 million.  The court is not persuaded that the value of the Property even exceeds the debt secured by the first and second trust deeds, approximately $2.3 million, excluding for argument sake the third priority obligation to Scripps GSB II that is cross-collateralized with the Guarantee Buildings.  The court is not persuaded that Mr. Allison's lump-sum valuation is based on an unbiased analysis of the Helm Building's present condition and the current market for "redevelopment" properties.  Mr. Palmer's appraisal may have contained some errors and omissions, but his conclusion was based on empirical data. Mr. Palmer was retained and paid by Scripps Investments to provide an appraisal, but he is also a licensed professional.  There was no evidence to suggest that he skewed the data or manipulated the facts to achieve a particular result.  In

light of the huge gap between Mr. Palmer's appraisal and the secured debt, over $6 million, the court is not persuaded that the questionable aspects in Mr. Palmer's appraisal were material. Even if Mr. Palmer missed the mark by 100%, that would only lead to a valuation of $2 million, which is still less than the debts secured by the first and second liens and would not affect the outcome of this motion.

## The Helm Building is Not Necessary to an Effective Reorganization – § 362(d)(2)(B).

When a creditor establishes that the chapter 11 debtor does not have equity in its property within the meaning of § 362(d)(2)(A), the burden shifts to the debtor to establish the second prong of the § 362(d)(2) inquiry, that the property is nevertheless "necessary to an effective reorganization." § 362(d)(2)(B). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective organization *that is in prospect*." (emphasis original.) *United Sav. Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375-76, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). This means that there must be "a reasonable possibility of a successful organization within a reasonable time." *Id.* at 376. (citation omitted.) The debtor's burden to make this showing increases as the exclusivity period expires. *Id.*

After the U.S. Supreme Court issued the *Timbers*' decision, the Ninth Circuit BAP refined the "effective reorganization" test, recognizing that after the expiration of the exclusivity period, "the debtor must offer sufficient evidence to indicate that a successful reorganization within a reasonable time is 'assured' " *Sun Valley Newspapers, Inc. v. Sun World Corporation (In re Sun Valley Newspapers Inc.)*, 171 B.R. 71, 75 (9th Cir. BAP 1994), citing *In re Holly's Inc.*, 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992).

A chapter 11 plan cannot be based upon a visionary scheme. *See* § 1129(a)(11); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,

13

761 F.2d 1374, 1382 (9th Cir. 1985).

After the debtor fails to confirm a chapter 11 plan, the bankruptcy court is not required to hold a hearing on every subsequent plan and disclosure statement before it can grant relief from the automatic stay under § 362(d)(2). "All that is required is that the court determine if a successful reorganization is possible within a reasonable period of time." *In re Sun Valley Newspapers, Inc.*, 171 B.R. at 74.

Just prior to expiration of the exclusivity period in this case, the Debtor filed a chapter 11 plan and a disclosure statement. The hearing to approve the disclosure statement has not yet occurred. However, the proposed plan is based on two assumptions, neither of which appear to be realistic: (1) that upon confirmation, the Debtor can service the restructured debt with income from the operation of its business, which includes rental income from the Helm Building, and (2) that the Debtor can permanently enjoin, through confirmation of the plan, any effort by Scripps Investments and its related entities to foreclose against the Guarantee Buildings.[7] The problems with the proposed plan include, *inter alia*, the facts that (1) the plan fails to demonstrate an adequate means for implementation (§ 1123(a)(5)), *i.e.*, that the Debtor has financing and a timetable to renovate and fully lease the Property and generate sufficient cash to satisfy the liens, and (2) the

---

[7]The Debtor holds a fifth priority trust deed against the Guarantee Buildings securing an obligation from AB Parking, which exceeds $4.5 million. The Debtor contends that its ability to collect this obligation is necessary to an effective reorganization. That trust deed is an asset of this estate, protected initially by the automatic stay, but the court has already ruled in a prior relief from stay motion that the fifth priority trust deed has no value to the Debtor unless and until AB Parking can find a buyer for, or refinance the debt against the Guarantee Buildings. The Guarantee Buildings are facing imminent foreclosure. On June 5, 2006, this court granted a motion for relief from the automatic stay to allow Scripps GSB I to foreclose its first priority trust deed against the Guarantee Buildings. On July 3, 2006, this court also granted relief from stay to allow foreclosure of the second and third trust deeds held by Scripps GSB II. On July 5, 2006, the bankruptcy court in the MDC bankruptcy (case no. 05-11402) approved an agreement for *nunc pro tunc* relief from stay allowing the Scripps entities to foreclose against MDC's fourth priority trust deed against the Guarantee Buildings. MDC has its own motion for relief from the automatic stay pending in this court which is set for hearing on July 20, 2006.

14

Debtor cannot restructure the senior debt against the Guarantee Buildings through its chapter 11 plan. *First Federal Bank of California v. Cogar (In re Cogar)*, 210 B.R. 803, 812 (9th Cir. BAP 1997) (the senior lienholder does not have a claim against the estate of the junior lienholder that could be modified through the junior lienholder's chapter 11 plan, even if the plan provides for transfer of the underlying real property to the debtor).

At the hearing of this matter, Mr. Allison and Mr. Briggs testified, in essence, that the Debtor's reorganization will require a significant infusion of new capital. The Debtor's counsel acknowledged that the proposed plan will have to be amended to address purported "recent developments" in the Debtor's efforts to find new financing. For purposes of this motion, the court therefore deems the present chapter 11 plan to be withdrawn. The exclusivity period has now expired and there is no plan before the court for confirmation. Without an actual plan to consider, the court must determine from the evidence presented if a successful reorganization within a reasonable period of time appears certain. The Debtor bears the burden of proof on this issue.

Based on the evidence, and the record of this case, the court simply cannot find for the Debtor on this issue. Mr. Allison testified that the Debtor is close to a "deal" with a purported investor to infuse a large amount of new capital into the business. But Mr. Allison would not disclose any of the terms and details of the purported deal, including the name of the investor, and the conditions for closing the escrow. Nothing has been filed in this case to seek approval of a new financing arrangement under § 364. Nothing was offered to show that the Debtor has developed a formal business plan. Mr. Allison testified that the Helm Building will produce a significant income stream in the form of rent from prospective new tenants, but he was not able to show how or when the renovations might be completed and ready to accept new tenants. Mr. Allison's hope to rent the Helm Building to government tenants is still in the request-for-proposal (RFP) stage.

15

Mr. Allison failed to show that the Debtor has a realistic operating budget, or that the anticipated gross income stream will translate into net income that would be sufficient to service the restructured debt. How and when the Debtor might be in a position to actually rent the Helm Building, and its ability to do so profitably, are at this point matters of pure conjecture. Any chapter 11 plan which presents the Helm Building as a properly capitalized, fully rented, and profitable business operation is, at this time, little more than a "visionary scheme." The Debtor's evidence falls far short of showing that a successful reorganization is assured, or even likely, within a reasonable period of time.

## Scripps Investments Cannot Seek Relief From the Automatic Stay on Behalf of Third-Party Junior Lienholders.

Scripps Investments is in a position to conduct the trustee's sale on its first trust deed once relief from the automatic stay is granted. Yet Scripps Investments also asks the court to grant relief for the benefit of all junior lienholders such that they might also commence and complete judicial or non-judicial foreclosure proceedings against the Helm Building. By implication, this would include the second trust deed held by MDC. The request will be granted only as to the first and third priority trust deeds.

This motion for relief from the automatic stay is a "contested matter" within the meaning of the Federal Rules of Bankruptcy Procedure. Under Fed.R.Bankr.P. 9014(a), a contested matter may be decided by motion, as opposed to an adversary proceeding. However, Rule 9014(c) incorporates many of the rules for adversary proceedings into contested matters. One of those is Fed.R.Bankr.P. 7017, which makes Fed.R.Civ.P. 17 applicable here. Rule 17(a) states that, "[e]very action shall be prosecuted in the name of the real party in interest."

One of the main purposes of Rule 17(a), known as the "Real Party in Interest" rule, is to protect litigants from suits by persons who do not hold, by substantive law, the rights to be enforced; those who do not have the power to

1  make binding decisions regarding prosecution, compromise and settlement. *10*

2  *Collier on Bankruptcy*, (15th Ed. Revised), ¶ 7017.02, pg. 7017-2.  The "Real

3  Party in Interest" rule applies to motions for relief from the automatic stay. *Roslyn*

4  *Savings Bank v. Comcoach Corporation (In re Comcoach Corp.)*, 698 F.2d 571,

5  573 (2nd Cir. 1983).

6       Here, Scripps Investments holds and controls, either directly or as manager

7  of Scripps GSB II, the power to enforce, prosecute, compromise and settle the

8  obligations secured by the first and third trust deeds against the Helm Building.  At

9  trial, for reasons which the court accepts, Scripps Investments declined to commit

10  as to the order in which it will actually foreclose those liens.  However, MDC is a

11  separate entity and it holds the rights to enforce or compromise the obligations

12  secured by the second trust deed.  MDC is not a party to this contested matter and

13  has not joined in the request for relief.  Indeed, MDC filed a written opposition to

14  this motion which states in pertinent part:

15         MDC, as creditor and junior lienholder, is continuing to evaluate how to
       proceed in this matter to liquidate its notes and lien against the Helm
16         Building for the benefit of its creditors.  At present, MDC has not
       determined how to proceed and has not authorized Scripps or anyone else to
17         proceed on its behalf in the A Partners bankruptcy case.  Moreover, MDC
       does not adopt the valuations or other allegations set forth by Scripps in the
18         Motion.  The issue of valuation is of significant importance not only to A
       Partners, LLC, but to its creditors and the creditors of MDC.  MDC reserves
19         the right to proceed as it sees fit in light of the best interests of its creditors
       and its estate.

20

21       The court can find no authority for the proposition that a senior lienholder

22  may seek relief from the automatic stay on behalf of one or more third party junior

23  lienholders.  The relief granted in this ruling will only apply to the first and third

24  trust deeds.

25  **Waiver of Rule 4001(a)(3).**

26       Federal Rule of Bankruptcy Procedure 4001(a)(3) provides that an order

27  granting a motion for relief from an automatic stay is stayed until the expiration of

28  10 days after the order is entered, unless the court orders otherwise.  Scripps

Investments requests that the court waive the application of this rule because the
Debtor is not paying Scripps Investments for the interest which will accrue during
the stay. Rule 4001(a)(3), which was added by the 1999 amendments to the
Federal Rules of Bankruptcy Procedure, recognizes that motions granting relief
from the automatic stay can have enormous consequences for the parties involved
and can often dictate the success or failure of the entire bankruptcy case. Rule
4001(a)(3) enables the debtor, or other party who opposes relief from stay, to seek
a stay pending appeal of an adverse ruling. *9 Collier on Bankruptcy*, (15th Ed.
Revised), ¶ 4001.04A, pg. 4001-18. "[W]ithout a stay pending appeal, appeals
from such orders can often become moot if the party granted relief proceeds with a
sale or some other action that cannot be easily undone." *Id.* at pg. 4001-19. For
that reason, the court is reluctant to make any ruling which prematurely terminates
the Debtor's appellate remedies.

Scripps Investments published a notice of sale under Cal.Civ.Code §
2924(f)(b) for its first trust deed before commencement of this bankruptcy. That
sale date has been continued pending a ruling on this motion. In theory, Scripps
Investments will be in a position to conduct a trustee's sale soon after this ruling is
entered. The timing and delay inherent in the State's statutory foreclosure scheme
will not give the protection here that is intended by Rule 4001(a)(3). Scripps
Investments' request to waive Rule 4001(a)(3) is appropriate only to the extent that
Scripps Investments may need to take some action to enforce the first and third
priority liens, so long as the foreclosure sale itself does not take place until at least
10 days after entry of the accompanying order.

## CONCLUSION

Based on the foregoing, the court finds and concludes that the Debtor has
no equity in the Helm Building. The court is not persuaded that the Helm Building
is necessary to an effective reorganization. Scripps Investments' motion for relief

18

1    from the automatic stay will be granted as to the first and third priority trust deeds

2    only.  The motion will be denied without prejudice as to all other liens.

3          Scripps Investments' motion to waive the 10-day stay provision of

4    Fed.R.Bankr.P. 4001(a)(3) will be granted in part.  Scripps Investments may

5    proceed to enforce the first and third priority liens under applicable law, so long as

6    the foreclosure sale does not take place until at least 10 days after entry of the

7    accompanying order.

8          Dated:   July  _/_ _/_ , 2006

9

10

11

12                                             W. Richard Lee
                                              United States Bankruptcy Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

CERTIFICATE OF MAILING

The undersigned deputy clerk in the office of the United
States Bankruptcy Court for the Eastern District of California
hereby certifies that a copy of the document to which this
certificate is attached was mailed today to the following
entities listed at the address shown on the attached list or
shown below.

See Attached

Fax:
    Albert Berryman
    559-432-5620

Fax:
    Estela Pino
    916-641-1888

DATED: 7/14/06

By: _____
            Deputy Clerk

EDC 3-070 (New 4/21/00)

Albert Berryman
5260 N Palm Ave #421
Fresno, CA 93704-2209

Estela Pino
4600 Northgate Blvd #215
Sacramento, CA 95834

A Partners LLC
2339 Kern St
PO Box 170
Fresno, CA 937

Office of the U.S. Trustee
2500 Tulare Street, Room 1401
Fresno, CA 93721